Filed 3/4/14  P. v. Arias CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038532 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC952349) |
| v. | |
| MARIO MARTINEZ ARIAS, | |
| Defendant and Appellant. | |

This appeal follows Mario Arias's retrial on one count of assault with a deadly weapon.  On appeal, Arias (appellant) challenges the in-court identification of him as the driver of a stolen Honda that was involved in a high speed police chase and a collision, on the ground that it was tainted by an unduly suggestive pretrial identification procedure.  Further, appellant contends that his confrontation rights were violated by the admission into evidence of hearsay statements of one of the officers involved in the chase.  Appellant asks this court to independently examine the in camera proceedings related to his *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531).  Finally, appellant asserts that the trial court abused its discretion in denying his *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497).  For reasons that follow we affirm the judgment.

*Proceedings Below*

On November 5, 2009, the Santa Clara County District Attorney filed an information in which appellant was charged with vehicle theft (Veh. Code, § 10851, subd. (a), count one), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), count two), driving a vehicle in the direction opposite to that of lawful traffic flow while fleeing a pursuing peace officer's motor vehicle (Veh. Code, § 2800.4, count three) and reckless driving while fleeing a pursuing peace officer's motor vehicle (Veh. Code, § 2800.2, subd. (a), count four). The information contained an allegation that appellant had a prior conviction for robbery (Pen. Code, § 211-212.5) within the meaning of Penal Code sections, 667, subdivisions (a) and (b) through (i) and 1170.12.

On July 29, 2010, the jury found appellant guilty of counts one, three and four, but hung 11-1 for guilty on the assault with a deadly weapon charge (count two). Accordingly, the court declared a mistrial as to that count.

Subsequently, on May 19, 2011, after appellant waived a jury trial on the prior conviction allegations, the court found the allegations to be true—that is, that appellant had a prior conviction for second degree robbery on charges that were brought and tried separately (Pen. Code, § 667, subd. (a)); and that it was a strike within the meaning of Penal Code sections 667, subdivisions (b)-(i) and 1170.12.

On January 17, 2012, the retrial on the assault with a deadly weapon charge began. On January 31, 2012, the jury found appellant guilty.

Thereafter, the court sentenced appellant to state prison for 14 years four months—that is, a term of eight years on count two (assault with a deadly weapon—the upper term of four years, doubled because of the prior strike conviction); a consecutive 16-month term for count one (the vehicle theft), a concurrent upper term of six years for count three (driving the wrong direction while fleeing from police), a concurrent upper term of six years for count four (reckless driving while fleeing a police officer) and a consecutive five-year term for appellant's prior serious felony conviction.

2

*Facts Adduced at the Second Trial*

On August 13, 2009, California Highway Patrol (CHP) Officer Shane Canela was driving a CHP patrol vehicle, a Ford Crown Victoria, on Montague Expressway in San Jose when he saw a green Honda traveling westbound at a high rate of speed. Officer Hyde, Officer Canela's partner, was in the patrol vehicle with him and they were both in full uniform. Officer Canela saw the Honda enter onto northbound 101. The officers followed the Honda and Officer Canela was able to "pace" the speed of the Honda, which he determined was traveling at 80 m.p.h.[1] The posted speed limit is 65 m.p.h.

Officer Canela moved the patrol vehicle directly behind the Honda and activated the patrol vehicle's red lights and siren. Officer Canela was able to see a silhouette of the driver, the only person in the vehicle. The Honda drove onto Great America Parkway and sped up to 90 m.p.h. The officers followed the Honda at a distance of between 50 and 100 feet. Officer Hyde radioed dispatch to inform them of their location.

The Honda turned right onto the two-lane on-ramp to eastbound 237. Just as Officer Canela was entering the ramp, the Honda made a U-turn and faced the patrol vehicle head-on at a distance of 50 to 100 feet away. Then, the Honda traveled at approximately 30 m.p.h. in the wrong direction back down the on-ramp head-on toward the patrol vehicle. Officer Canela was able to see that the driver was a male. He heard Officer Hyde say something to the effect "he's going to ram us." Officer Canela slowed down his patrol vehicle and swerved to the left. Traveling at approximately 30 m.p.h., the Honda made a slight right turn and continued on Great America Parkway, ran a red light at the intersection, and turned left onto the on-ramp to westbound 237.

Officer Canela followed behind the Honda at a distance of approximately 50 feet. There was no other traffic on the on-ramp. The driver of the Honda slammed on his

---

[1] Officer Canela explained that a vehicle pace occurs when the CHP car matches the speed the other vehicle is going and from that the officers can determine the other vehicle's speed.

brakes while the car was traveling at approximately 30 to 45 m.p.h. Officer Canela hit the brakes in the patrol vehicle to avoid hitting the Honda. The driver of the Honda accelerated the car to approximately 30 to 45 m.p.h. and again slammed on the brakes, which caused the car to lurch forward and then back. Officer Canela, who was 50 feet behind the Honda at this time, hit the brakes of his vehicle and turned to the left to avoid a collision.

Travelling at approximately 60 m.p.h. Officer Canela moved his patrol vehicle over the gore point into the traffic lane next to the on-ramp.[2] At this time, the Honda was still on the on-ramp approximately 50 to 100 feet in front of the CHP vehicle. Within seconds, while traveling at approximately 60 m.p.h, the Honda made a sharp left turn and headed toward the patrol vehicle. Officer Canela braked and slowed to 30 to 40 m.p.h. He veered left as he heard Officer Hyde say something to the effect of "he's coming at us." The Honda crossed the path of the CHP vehicle perpendicularly. Officer Canela was able to look over the hood of his vehicle and made eye contact with the driver who was five to six feet away. The driver was well lit by the headlights from the patrol vehicle; he was wearing dark clothing. Officer Canela testified that he saw the driver clearly. The Honda and the patrol vehicle collided; the patrol vehicle's right front and the Honda's left rear made contact. The patrol vehicle shifted left and the Honda traveled forward into the fast lane until its front end collided with the guardrail next to the center divider. Officer Canela maneuvered his patrol vehicle out of the traffic lane and he and Officer Hyde got out and approached the Honda. No one was inside.

Officer Canela saw the suspected driver run across the oncoming traffic in the eastbound lanes of 237. Officer Canela jumped over the guardrail and chased the suspect across the eastbound lanes and down a steep dirt embankment. Officer Canela trailed the suspect at a distance of approximately 30 to 50 feet; the suspect was wearing a black shirt

---

[2]     Officer Canela described the gore point as where two white lines meet and form a triangle to divide the traffic on the freeway from the traffic on the on-ramp.

and blue jeans. At the bottom of the embankment, the suspect climbed over a chain link fence and ran into a parking lot that was well-lit by light posts and lights from buildings. The suspect turned and looked over his left shoulder at Officer Canela and made eye contact. Officer Canela could see half to three quarters of his face; he recognized him as the driver of the Honda. The suspect ran around a corner and out of sight. Officer Canela returned to his patrol vehicle. During the chase, Officer Hyde reported to dispatch intermittently to report on their status; she said that the collision happened at 12:52 a.m.

Officer Canela saw that the Honda's tires left friction marks on the roadway; the airbags in the two vehicles had not deployed. He testified that airbag deployment can depend on the point of impact, such as whether it was a head-on collision versus a sideswipe.

At 1:20 a.m. CHP Officer Manuel Nevarez, who was assigned to the auto theft task force, reported to the scene. Officers conducted an inventory search of the Honda and located a cellular telephone on the front passenger seat, three 32-ounce cold bottles of Miller High Life beer and two Safeway bags. The ignition in the Honda was "punched" meaning damaged. Officer Nevarez looked through the information on the cellular telephone and traced the number; he discovered the subscriber's name was Mario Arias, and the subscriber's address was 2151 Oakland Road, Space 63, San Jose. Officer Nevarez was able to access a log of the incoming and outgoing calls. Officer Nevarez did not process the Honda for fingerprints because it was still dark and cars were traveling by at high rates of speed; the next day he tried to lift prints from the beer bottles but was unsuccessful. He did not attempt to lift prints from the cellular telephone as he felt confident that the information he retrieved from the telephone would lead to the suspect's identification. Officer Nevarez called into dispatch the Honda's license plate number and learned that the car was registered to Jon Van; the car was reported stolen.

Officer Nevarez called dispatch to ask that officers contact the manager at the

5

nearby Safeway on Montague Expressway to try to secure video surveillance of someone who had been purchasing beer. Officers Rasmussen and Sousa went to the Safeway and contacted the store's security team. Officers Nevarez, Canela and Hyde drove to the Safeway and watched the store's video surveillance tape, which was date and time stamped. They saw a bald Hispanic male with a mustache, who was wearing a black shirt walk into the store, buy bottles of alcohol and then walk out carrying a bag. The man held a cellular telephone in his hand. Immediately upon viewing the surveillance video, Officer Canela recognized the man as the driver of the green Honda, and as the person he saw running and climbing over the fence. In court, Officer Canela identified appellant as the driver of the Honda. Portions of the surveillance video were played for the jury.

Officer Nevarez asked dispatch to conduct a search for the name Mario Arias; he gave them an approximate age for the person. Dispatch narrowed the search to approximately 10 to 15 people. At approximately 2:00 a.m. San Jose Police Officer Jessor made contact with Officer Nevarez in the parking lot of the Safeway store. Officer Jessor used his mobile computer to display a photograph of a Mario Arias, date of birth December 9, 1967. Officer Nevarez identified the Mario Arias in the photograph as the same man that was purchasing beer in the Safeway surveillance video. Officer Jessor showed Officers Canela and Hyde the photograph. Officer Canela recognized the man in the photograph as the driver of the green Honda.

Later in the day on August 13th, Officer Nevarez arrested appellant at his residence on Old Oakland Road. In court Officer Nevarez identified appellant as the person he arrested.

At trial, Jon Van testified that the Honda belonged to him and that it was stolen on June 13, 2009.

Aurora Valenzuela testified that she was appellant's girlfriend and they had been together for four years. They lived in the same mobile home park. Ms. Valenzuela said that she was with appellant on August 13, 2009 from approximately 12:30 to 1:00 a.m.

6

In fact, she had driven her sister's car to take appellant to Safeway. She parked the car on the street in front of the store on Montague Expressway and waited for two to five minutes for appellant after he went into the store; appellant walked out of the store carrying a Safeway bag. He did not get into her car directly, but walked around other cars. When he got back into her car he was not carrying the Safeway bag. Ms. Valenzuela drove appellant back to the mobile home park; when they got there she saw appellant walk over to his home, which was nearby.

Ms. Valenzuela testified that initially appellant told her that they were going to Safeway to buy beer. When she asked him why he returned to the car without beer, appellant told her he just bought the beer to get change.

On cross-examination, Ms. Valenzuela admitted that after she found out that appellant had been arrested she did not contact the police, appellant's attorney, or any investigator to tell them that she was with appellant between midnight and 1 a.m. on August 13th. Approximately four months after appellant was arrested, a defense investigator telephoned her; she told the investigator that appellant was inside Safeway for approximately 10 minutes. However, she did not mention that appellant left Safeway with a bag, or that he walked over to some cars that were behind her or that when he got back into her car he did not have a bag. Ms. Valenzuela admitted that in 2007 she gave a false name to a police officer.[3]

Peter Rast, a forensic engineer, testified for the defense as an expert in the area of

---

[3] At his first trial, appellant testified in his own defense that he was with Ms. Valenzuela between midnight and 1 a.m. on August 13th. He admitted that he was the person in the Safeway surveillance video purchasing beer and talking on his cellular telephone. He explained, however, that when he left the Safeway he met a man in another car and bought marijuana from him. He said he left the beer in the car and returned to Ms. Valenzuela's car. Later that morning he realized he had lost his cellular telephone. Appellant admitted that in 1995 he was convicted of petty theft with a prior conviction for theft. He denied that he had been involved in a high speed chase with CHP that ended in an accident on westbound 237.

accident reconstruction. Specifically, he was qualified as an expert regarding point of impact, a vehicle's position at the point of impact, the direction of travel at the time of impact, and the relative speeds of the vehicles at time of impact. After defense counsel gave Mr. Rast a hypothetical situation based on the facts of this case, he opined that the CHP patrol vehicle "actually turned into the green Honda, hit the green Honda, the right front of [the patrol vehicle] hit the left rear of the green Honda and pushed the green Honda forward into the guardrail . . . ." Mr. Rast opined that the damage shown in photographs of the two cars showed "all forward movement"; and the damage "was consistent with a rear impact as opposed to any kind of side impact." Mr. Rast stated that since the airbags did not deploy in the CHP patrol vehicle it suggested that the vehicle's speed at impact was less than 12 to 15 m.p.h.

On cross-examination, Mr. Rast admitted that he had not talked to the CHP officers that were involved in the car chase and that his opinion was based on material received from defense counsel's office, including CHP reports and Officer Canela's preliminary hearing testimony, as well as photographs of the damage to the vehicles. His conclusion that the Honda did not drive directly at the patrol vehicle meant that the Honda did not drive at a 90 degree approach.

*Discussion*

*The Pretrial Identification Procedure*

Before appellant's first trial, he filed a motion to exclude "suggestive pretrial and in-court identification." He requested an Evidence Code section 402 hearing (402 hearing) "regarding the police pretrial photographic identification procedures." At the 402 hearing, both Officer Hyde and Officer Canela testified to the events surrounding the car chase.[4] Relevant here, Officers Canela and Hyde testified that they viewed the surveillance video from the Safeway store that showed multiple angles of a man walking

---

[4] In essence, their testimony regarding the actual chase and events surrounding it as well as the crash, was consistent with Officer Canela's testimony at the second trial.

into the store, buying three 32-ounce bottles, and then leaving the store. Simultaneously, they both identified that man as their suspect in the car chase. They watched the video multiple times. When they enlarged the images, immediately, they both confirmed their identification of the suspect.

Both officers said that between 15 and 30 minutes later, Officer Jessor, who was monitoring their radio communications, met them in the Safeway store's parking lot. Officer Canela said that Officer Jessor told him that a week before this incident he went to the home of a Mario Arias and spoke to him about a separate incident. Officer Jessor pulled up Arias's booking photograph on his car's computer monitor. Officer Canela said he looked at the photograph for three to five seconds and identified the person in the photograph as the driver of the Honda and the man on the surveillance video. Office Hyde said that she viewed the photograph and instantly identified the person in the photograph as their suspect. Officer Canela testified that his in-court identification of appellant as the driver of the Honda was based on his visual observations of the suspect when he drove the Honda toward the patrol vehicle and when the suspect jumped over the fence and looked back. Officer Hyde said that her in-court identification of appellant as the driver was based on her observations of the suspect as he ran and turned to look at her and Officer Canela; it was not based on her viewing the surveillance video.

Defense counsel argued that the officers' identification of appellant were suggestive because the officers viewing the surveillance video and booking photograph was the same as allowing a victim witness to make an identification based on a one photograph showing. Thus, he asserted, this procedure tainted any in-court identification by the officers. Counsel requested that the court suppress the officers' in-court identification of appellant.

The prosecutor countered that both Officers Canela and Hyde testified that their identification was based solely upon their observations of appellant during their pursuit and not upon the Safeway surveillance video. He argued that Officer Canela had twice

9

had the opportunity to view appellant—once when he drove across the lanes directly toward the patrol car and once again when the officer was chasing appellant down the embankment into the well lit parking lot where appellant turned to see if the officers were chasing him. Further, during the chase Officer Canela had described the suspect as a male Hispanic, with a bald head, and he was wearing blue jeans and a black T-shirt. This occurred before the officers viewed the Safeway surveillance video.

The court denied the motion to exclude the in-court identification testimony from Officers Canela and Hyde.

At appellant's retrial on the assault with a deadly weapon charge, defense counsel filed an identical motion to "exclude suggestive pretrial and in-court identifications." The court denied the motion; the court pointed out that it had held a 402 hearing on this issue and there was no need for a second 402 hearing.

Under established law, a witness identification procedure will violate the due process clause if the state initiates an unduly suggestive procedure " 'which suggests in advance of identification by the witness the identity of the person suspected by the police.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*).) The defendant bears the burden of showing an unreliable identification procedure. (*Ibid.*) "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) If a court concludes that a challenged procedure is not unduly suggestive, it need not consider whether the

10

identification was nevertheless reliable.  (*Ochoa, supra*, 19 Cal.4th at p. 412.)

We apply a deferential review of the trial court's factual findings and credibility determinations, but we apply an independent standard of review.  (*People v. Kennedy* (2005) 36 Cal.4th 595, 609, disapproved of on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

In essence, appellant analogizes the procedure by which the CHP officers identified him as the driver of the green Honda to the practice of showing witnesses single photographs of suspects rather than as part of a line-up with other photographs. Appellant argues that when they viewed the surveillance video and the booking photograph the officers were victims of the crime.

Respondent argues that Officers Canela and Hyde did not participate in a witness identification procedure that is governed by case law prohibiting unduly suggestive witness identification procedures.  Respondent contends that the officers went to the Safeway to investigate the evidence of the Safeway bags and cold beer found in the Honda and to determine if the store's surveillance videotape showed a person matching the description of their suspect who had purchased beer.  As we shall explain, we agree with respondent that the CHP officers did not take part in a procedure governed by the case law prohibiting unduly suggestive witness identification procedures.

First, we point out that when a law enforcement officer views a suspect for the purposes of that officer's own investigation, the policy prohibiting unduly suggestive identification procedures cannot apply because an officer cannot unduly suggest something to him or herself.  Although we have found no published case on point from this state, courts from other states have suggested that while the "use of a single photograph would be highly suggestive in a case where the police were working with a victim or potential untrained lay witness to obtain an identification" when an officer is involved he "could not be found through the photo identification process to have impermissibly suggested *to himself* the person" he saw on a particular date.  (*State v.*

11

*Manna* (1988) 130 N.H. 306, 312, 539 A.2d 284, 287.) Similarly, in *Miles v. State* (Ind.App., 2002) 764 N.E.2d 237, an Indiana Court of Appeals noted, "Our supreme court has long held that the extrajudicial exhibition of a single photograph to a victim is an unduly suggestive identification procedure. [Citations.] While we agree with this principle, we find it inapplicable in this case, where [the police officer] is both the investigator and the witness to the offense." (*Id*. at p. 240.)

We hold that Officers Canela and Hyde did not participate in an unduly suggestive pretrial identification procedure. Crucial to our decision is that the "victims" making the identification were experienced, trained law enforcement officers accustomed to investigating cases, as such we find the probability of misidentification highly unlikely. We find support for this conclusion in *U.S. v. Sanders* (8th Cir. 1976) 547 F.2d 1037 (*Sanders*), a case involving a station house "showup."[5] In *Sanders*, three of the witnesses who conducted the surveillance of the defendant in a parking lot at a Schnucks Market were agents of the Federal Bureau of Investigation and the fourth was a trained security officer with five years of experience as a security manager at United Parcel Service. (*Id*. at pp. 1039-1040.) The defendant was arrested when he entered a police station to borrow a quarter. (*Id*. at p. 1039.) Each of the four witnesses who made in-court identifications of the defendant had reported to the police station within two hours after the original incident. (*Id*. at p. 1040.) The defendant contended that the in-court identifications should have been excluded because they were tainted by showups which occurred at the police station following his arrest. (*Ibid*.) The Eighth Circuit Court of Appeals disagreed. The court explained, "[t]hese are not inexperienced lay witnesses who might be expected to infer from the stationhouse showup that the arresting officers believed they had the culprit, thereby influencing the witnesses' identification. [Fn. omitted.] The officers were in the course of their investigation; they were looking for

---

[5] A showup is the practice of showing suspects singly to witnesses for the purpose of identification. (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 38.)

[the defendant], whose name and address they already had; and their purpose at the showup was to see whether [the defendant] was in fact the person they saw at Schnucks. Under the totality of circumstances presented by this case, we cannot say that the showup procedure was so manifestly unjust as to make the failure of the District Court to exclude the in-court identifications plain error." (*Id.* at pp. 1040-1041.)

In sum, we conclude that the in-court identification of appellant as the driver of the green Honda was not the result of an unduly suggestive pretrial identification procedure. Accordingly, it is not necessary to consider whether the identification was reliable. (*Ochoa, supra*, 19 Cal.4th at p. 412.)

*Confrontation Clause*

At appellant's first trial, Officer Hyde testified that appellant drove onto the on-ramp to eastbound 237, made a U-turn and drove back down the on-ramp head on toward the patrol vehicle. Officer Hyde told the jury that she "alerted [Officer Canela] that the vehicle was coming straight at [them]"; and that "in order to avoid a collision [Officer Canela] attempted to maneuver to the left and exit away from the vehicle."

Later in her testimony, Officer Hyde told the jury that appellant drove onto the on-ramp to westbound 237; that the CHP patrol vehicle was in the traffic lane next to the on-ramp; that appellant turned left "towards [the] patrol vehicle and [was] facing almost perpendicular to the guardrail"; and that "[b]asically, at that point [she] told Officer Canela that the vehicle [was] coming straight at [them]. Officer Canela at that point steered the vehicle to the left in order to avoid the collision and began moving toward . . . the Number 1 lane of traffic."

At appellant's second trial, Officer Hyde was on maternity leave and unavailable to testify. In limine, the prosecution sought to introduce two statements that Officer Hyde made to Officer Canela during the car chase as "spontaneous statements." Specifically, the prosecution sought to introduce Officer Hyde's statements " 'He tried to ram us!' " and " 'Watch out! He's coming right at us!' " Defense counsel opposed the

13

motion and asked for a 402 hearing.

While discussing the matter during in limine motions, the court stated, "on its face, [the] spontaneous statement as the attorneys described it to me appears to be a spontaneous statement . . . . There's actually two statements." The court indicated that a 402 hearing with Officer Canela was appropriate and that the court would research the "*Crawford* issues."[6] The court took the matter under submission pending the 402 hearing.

A few days later, the court addressed the *Crawford* issue. Specifically, the court noted that it "discussed again with counsel the issue of the alleged spontaneous statement by Officer Hyde and the discussion and analysis is broken into different parts. First whether there was a *Crawford* violation. And second is whether there is a spontaneous statement exception to the rule against hearsay. I am going to table the issue of spontaneity until such time I [have] received all information on that topic, so that [it is] memorialized on the record all in one place. [¶] At this time I am going to talk about the *Crawford* issue. Officer Hyde's statement to the affect [*sic*] of he tried to ram us, look out, here he comes again, et cetera, would not violate *Crawford* because those statements are not testimonial. They were given from one peace officer to another peace officer during the pending danger. [¶] There are no cases that say such a statement from one officer to another is considered testimonial. There are many cases that support the proposition that this kind of statement is non-testimonial. Because those statements are non-testimonial *Crawford* does not apply." Off the record, defense counsel objected to the court's Crawford analysis. However, on the record, the court stated that it had not "yet ruled on that issue and I may exclude the statement or I may include the statement, but I haven't made up my mind because I haven't reviewed the information on the 402 hearing yet. And once I do that then I will make my ruling, but there is an ongoing

---

6        We assume that the court was referring to the Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36.

14

objection by the defense of this entire piece of evidence."

At the 402 hearing, Officer Canela testified to the events surrounding the car chase. Specifically, he stated that when the Honda entered the on-ramp to eastbound 237 he followed in the patrol vehicle. As the driver of the Honda made a U-turn and started to drive head on toward the patrol vehicle he heard Officer Hyde excitedly and loudly say "something along th[e] lines" of "he's coming at us." After the prosecutor refreshed his recollection with Officer Hyde's report that she wrote about the car chase, Officer Canela testified that Officer Hyde said "he was trying to ram us." However, from his personal recollection he could not remember exactly what she said. Officer Canela said that he swerved to the left and the driver of the Honda served to the right and drove off the on-ramp. Once onto the on-ramp to eastbound 237, the driver of the Honda made a sharp left turn toward the patrol vehicle. Again, excitedly, Officer Hyde said "something along the lines of he's coming at us." Then, the cars collided. Officer Canela said that during the pursuit his pulse was elevated and he had "an adrenaline rush." He said he was nervous and fearful. Defense counsel played for the court the audio recording of the communication between Officer Hyde and dispatch. The prosecutor asked Officer Canela if Officer Hyde's voice on the audio tape was her normal conversational speaking voice; Officer Canela said that it was not, it was "[a] little bit more rapid pace."

The court ruled that Officer Hyde's statements to Officer Canela were admissible because they were "spontaneous statements and they are considered exceptions to the rule against hearsay . . . ." The court stated that in the "audio portion of the tape that was played there's a statement that the vehicles are traveling at 98 miles per [hour]. There is tense but professional conversation between the declarant and the dispatch operator. You can hear sirens on the audio tape. Officer Hyde is asking for help by way of air support. [¶] The statements spoken during the actual incident that are being sought to be introduced are not contained in the audio tape because they were said from Officer Hyde to Officer Canela, they weren't transmitted to the 911 dispatcher. But if you look at the

15

statements that came before and after the alleged statements that are being sought to be introduced in both the transcript and in listening to it in the audio, the declarant sounds like she was under the stress of the event. It's not as if ten minutes had gone by when these statements were made. The statements were actually said at the exact time of the alleged ramming and attempted ramming, because that is what the content of her statements were. [¶] Officer Canela testified that the statements were made at the time of the alleged ramming and he testified her voice was not normal, it was rapid. She was nervous and it was a louder voice, maybe not because of the excitement of the situation but because there were sirens blaring and she had to be heard by her peace officer partner. [¶] He testified his own pulse was elevated, and he was experiencing an adrenaline rush at the time these statements were made, so for all those reasons I am going to enter them as excited utterance."

Defense counsel objected on the ground that Officer Hyde's statement "about he tried to ram us" was speculative and spoke "to intent." The court said that it had taken those factors into consideration, but that "it doesn't make them less of an excited utterance." Defense counsel responded that the statements were "still speculative and as such [were] objectionable." The court continued, "Well, what I am taking it as is her experience of seeing a car coming towards her was in a way that she felt it was trying to ram them. . . . [¶] So it wasn't getting into the mind of the operator of the vehicle, it was what she saw, the car coming towards her. . . . [¶] I think it's within the realm of reasonableness to give that to the jury and then you can argue it was trying to guess what was in his mind, but this is kind of common sense, this isn't—it's not splitting fine hairs." Defense counsel persisted, "it's speaking to intent and I think that's the reason for it, it would have to be speculative." The court was not persuaded and ruled that although the court understood counsel's position, the court was "going to let the position of what she saw."

Accordingly, the court allowed Officer Canela to testify to what he heard Officer

16

Hyde say as noted *ante*. The court admonished the jury that as to the "statement 'He's going to ram us' I am allowing that only as Officer Hyde's statement of what she saw in the car coming towards her. It is not to be considered by you as a statement by Officer Hyde of what was in the mind of the driver of the vehicle, because that would be speculation. [¶] Does everybody understand that? Everyone is shaking their head yes. Does anyone have any further questions about that? Thank you very much." Similarly, when Officer Canela testified that he heard Officer Hyde say "something to the effect of he's coming at us" the court immediately admonished the jury that it was "to be taken by you as a description of what the officer saw, not what the officer was guessing was in the mind of the driver because she can't."

Appellant contends that the trial court erred in admitting Officer Hyde's statements to Officer Canela that she uttered when appellant drove his car at the patrol vehicle. Appellant does not challenge the trial court's ruling that the hearsay statements were spontaneous and therefore admissible under Evidence Code section 1240, nor does he argue that the statements when made were testimonial. Rather, appellant contends that once Officer Hyde recorded her non-testimonial statements in her police report, the statements became testimonial in nature and, therefore, the admission of the statements violated his right to confrontation under *Crawford v. Washington*, *supra*, 541 U.S. 36 (*Crawford*) because Officer Canela had no independent recollection of exactly what Officer Hyde said.

In *Crawford, supra,* 541 U.S. 36, the United States Supreme Court held that the admission of testimonial statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 59–60.)

In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), the California Supreme Court noted that "[a]lthough the high court has not agreed on a definition of 'testimonial,'

17

testimonial out-of-court statements have two critical components.  First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution."  (*Id*. at p. 619.)

Assuming for the sake of argument that Officer Hyde's statements were testimonial, a violation of the Confrontation Clause is subject to harmless-error analysis.  In *Chapman v. California* (1967) 386 U.S. 18, 24, the United States Supreme Court stated, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  In *Delaware v. Van Arsdall* (1986) 475 U.S. 673, the Supreme Court applied the *Chapman* test to a Confrontation Clause violation and listed several factors courts should consider in determining whether such an error is harmless beyond a reasonable doubt.  Some of these factors are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  (*Id*. at p. 684.)  In analyzing each of these factors in this case, we conclude even if Officer Hyde's statements were testimonial once reduced to writing and there was error in admitting them at trial without allowing for cross-examination of Officer Hyde, such error was harmless beyond a reasonable doubt.

Officer Hyde's statements played only a minor role in the prosecution's case.[7]  The statements did not provide any new evidence because there was so much other testimonial evidence presented at trial to prove what appellant did while driving the green

---

[7]    We reject any suggestion by appellant that the jury could have used the statements as evidence of his intent.  The trial court specifically admonished the jury that Officer Hyde's statements were not to be considered as evidence of appellant's mental state.  "In the absence of some indication to the contrary, it is presumed the jury followed the instructions."  (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.)

18

Honda during the pursuit. Officer Canela, who testified, gave essentially the same information about the pursuit and appellant's actions. Officer Hyde's statements were simply the frosting on the cake. The information that Officer Hyde's statements provided was merely cumulative of Officer Canela's trial testimony.

In sum, we conclude beyond a reasonable doubt that any assumed error in admitting Officer Hyde's statements to Officer Canela at trial was harmless.

*Pitchess Material*

In appellant's first trial, pursuant to *Pitchess v. Superior Court*, *supra*, 11 Cal.3d 531, defense counsel filed two motions to discover the personnel records of both Officers Canela and Hyde. In general, defense counsel sought records relating to dishonesty and moral turpitude. The court granted the motion and held an in camera hearing at which the custodian of records for the CHP was sworn and testified as to the contents of the officers' personnel records.

Appellant requests that we conduct an independent examination of the in camera proceedings. Respondent does not object, but requests a fair opportunity to respond before we conclude that the trial court erred in denying defense counsel's motion.

In *Garcia v. Superior Court* (2007) 42 Cal.4th 63, the California Supreme Court explained: "In *Pitchess, supra,* 11 Cal.3d 531, 'we recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in [a] law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge. "In 1978, the California Legislature codified the privileges and procedures surrounding what had come to be known as '*Pitchess* motions' . . . through the enactment of . . . sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045." [Citation.] By providing that the trial court should conduct an in camera review, the Legislature balanced the accused's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records.' (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219–1220 (*Mooc*).)" (*Id*. at pp. 69–

70, fns.omitted.)

In *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, our Supreme Court clarified that "[t]he trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' (§ 1045, subd. (b); [citation].)  Typically, the trial court discloses only the names, addresses, and telephone numbers of individuals who have witnessed, or have previously filed complaints about, similar misconduct by the officer." (*Id.* at p. 1019.)

The *Mooc* court explained in detail how an in camera hearing should be conducted.  "When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.]  A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. [Citation.]  Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review.  But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not the prosecution or the custodian of records.  The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion.  A court reporter should be present to document the custodian's statements, as well as any questions the trial court

20

may wish to ask the custodian regarding the completeness of the record. [Citation.] [¶] The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review." (*Mooc, supra,* 26 Cal.4th at pp. 1228–1229.)

The *Mooc* court rejected a suggestion that the custodian of records must always produce the *entire* personnel file in response to a *Pitchess* motion, noting that the custodian's obligation is to produce only those documents from the file "that were potentially responsive to [the] defendant's specific request." (*Mooc, supra,* 26 Cal.4th at p. 1230.)

A reviewing court "routinely independently examines the sealed records of such in camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

At the in camera hearing in this case, Deputy Attorney General William McMahon, the custodian of records for the CHP was placed under oath and described the records that exist for CHP officers, how the files are set up, as well as the search that was conducted of those records for documents responsive to defense counsel's *Pitchess* request. The records included the officers' personnel files and the CHP's internal affairs database, which Mr. McMahon explained would contain any adverse actions taken against the officers as well as citizen complaints.

Mr. McMahon testified that Officer Canela had no history of adverse actions in either his personnel file or the internal affairs database, but there was one citizen complaint that did not involve dishonesty or moral turpitude.[8] Officer Hyde's records showed no history of adverse actions and no history of citizen complaints. Accordingly, the court concluded that there were no records that were discoverable.

---

[8] Mr. McMahon summarized the contents of the complaint for the court, after which the court determined that it was not discoverable.

Having reviewed the sealed transcript of the in-chambers proceeding, independently, we conclude that the trial court did not abuse its discretion in ruling upon appellant's *Pitchess* motion.

*Failure to Strike Appellant's Prior Strike Conviction*

Before appellant's sentencing hearing, on May 2, 2012, pursuant to *Romero*, *supra*, 13 Cal.4th 489, appellant requested that the court exercise its discretion to strike his prior strike conviction in the interest of justice. The prosecution filed opposition to appellant's motion. At appellant's sentencing hearing held on June 8, 2012, the court denied appellant's *Romero* motion. Specifically, after taking into consideration the "nature and circumstances" of appellant's conviction, the circumstances of which the court found to be "egregious," the age of appellant's prior serious/violent felony conviction, appellant's failure to refrain from "criminal activity," some of which occurred while appellant was on probation or parole, and the particulars of appellant's background and his character, the court denied appellant's request.

Appellant contends that the court abused its discretion in denying his motion. Respectfully, we disagree.

Section 1385, subdivision (a), empowers a court, on its own or the prosecutor's motion, to "order an action to be dismissed" in furtherance of justice.[9] "Although the statute literally authorizes a court to dismiss only an entire criminal action, [the California Supreme Court has] held it also permits courts to dismiss, or 'strike,' factual allegations relevant to sentencing, such as those that expose the defendant to an increased sentence. [Citations.]" (*People v. Lara* (2012) 54 Cal.4th 896, 900–901.) A "defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under

---

[9] Subdivision (c)(1) of section 1385 provides: "If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)."

section 1385," however, a defendant has "the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)

In deciding whether to dismiss a prior conviction allegation under the three strikes law pursuant to Penal Code section 1385, and in reviewing such a ruling, courts "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

"While a court must explain its reasons for striking a prior [citations], no similar requirement applies when a court declines to strike a prior [citation]. 'The absence of such a requirement merely reflects the legislative presumption that a court acts properly whenever it sentences a defendant in accordance with the three strikes law.' [Citation.] 'Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper.' [Citation.]" (*In re Large* (2007) 41 Cal.4th 538, 550–551.)

"[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony, supra,* 33 Cal.4th at p. 374.) This standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*Williams*, *supra*, 17 Cal.4th at p. 162.)

23

"[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]. Moreover, 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce [ ] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case. [Citation.]" (*Carmony*, *supra*, 33 Cal.4th at p. 378.) Unless a trial court fails to exercise its discretion or denies *Romero* relief for an impermissible reason, a defendant challenging a failure to grant such relief must establish the relevant factors under *Williams* "manifestly support the striking of a prior conviction and no reasonable minds could differ . . . ." (*Carmony*, *supra*, at p. 378.)

One appellate court has held that a "trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998 (*Cluff*) [record did not support critical inference upon which the court relied in denying motion to strike]; see *Carmony*, *supra*, 33 Cal.4th at p. 379 [distinguishing *Cluff*].)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citation.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at pp. 376–377.)

Appellant contends that his prior conviction was from 1989 and was committed when he was 21 years old and he admitted the offense at the time. According to appellant this is the only violent act that he has committed and it occurred more than 20 years ago. Appellant asserts that his other convictions stem from his history of substance abuse and the bulk of his convictions occurred when he was a younger man and it has been more than 10 years since his last serious offense. Appellant characterizes his current offenses as involving a high degree of recklessness, but asserts that there was no intent to hit the patrol car or injure the officers. As to his background and future prospects, appellant argues that he is a 45-year-old father of five and a grandfather and at the time of his arrest he had a long-standing substance abuse issue. Appellant argues that although he has made some poor choices and made mistakes he has used his time in custody to work on his substance abuse issues and has completed the Roadmap to Recovery Program. Further, before his arrest he worked with a temporary employment agency and had assisted in caring for his wife, who was ill for many years before her death in 2008.

As detailed in the probation officer's report, appellant's prior strike conviction for robbery occurred in 1990 and was the result of an incident that occurred in 1989. Specifically, "on December 13, 1989, the victim was celebrating a Christmas party at the Embassy Suite Hotel in Milpitas. At approximately midnight, the victim entered the women's restroom. As she exited the toile[t] stall, she was confronted by the defendant who was standing inside the women's bathroom. The defendant punched her one time to the front of her forehead. He then used both hands to push her against the stall wall. He then grabbed her purse from her hand, breaking the chain strap[,] which had been over her left shoulder. The defendant fled the restroom. [¶] . . . The defendant was stopped in his vehicle approximately three miles from the hotel." "He later admitted hitting the victim and taking her purse as he needed money. He also admitted driving his vehicle on a suspended license."

Further, according to the probation officer's report, appellant's criminal history

includes four felony and 25 misdemeanor convictions. His felony convictions include possession of drugs/alcohol in prison/jail in 1988 and following his robbery conviction he had a second degree burglary conviction and a conviction for possession of a controlled substance. Appellant has served at least two prior prison terms and violated his parole at least three times. His misdemeanor convictions include numerous Vehicle Code and Health and Safety Code violations involving alcohol and illegal substances, as well as convictions for battery and theft.

*Williams*, *supra*, 17 Cal.4th 148 is instructive. As our Supreme Court observed in *Williams*, a case where the defendant was convicted of driving under the influence four times (*id* at p. 152) and had a lengthy criminal history (*id.* at p. 154), " 'the existence of such convictions reveals that [he] had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable—but had failed or refused to learn his lesson.' " (*Id.* at p. 163.) The defendant in *Williams* had had a substance abuse problem since he was nine years of age; he apparently recognized the fact and stated a desire to change; but he did not follow through in efforts to bring the situation under control. The defendant was unemployed; he lived alone although he had cohabited with a woman for five or six years, and had two children with her, one of whom was disabled; and he wished to receive probation in order to help care for this child. (*Id.* at p. 155.)

The court in *Williams* observed: "[T]here is little favorable about [the defendant]'s background, character, or prospects. We do not ignore the fact that he apparently had had a stable living arrangement with a woman, had expressed a desire to help care for their disabled child, and was still loved, and supported, by his family. But neither can we ignore the fact that he was unemployed and did not follow through in efforts to bring his substance abuse problem under control. Certainly, that he happened to pass about 13 years between his prior serious and/or violent felony convictions and his present felony, and proceeded from about 20 years of age to 32, is not significant. He did not refrain from criminal activity during that span of time, and he did not add maturity to age. Quite

26

the contrary. In those years, he was often in prison or jail; when he was not, he violated parole and, apparently, probation, and committed the offenses that resulted in his convictions . . . ." (*Williams, supra,* 17 Cal.4th at p. 163.)

Appellant argues that without the enhancement for the prior strike conviction his sentence would have been nine years; a sentence, which he contends, is commensurate with the furtherance of justice in this case. Accordingly, he argues that the court's refusal to strike the strike was an abuse of discretion.

Manifestly, appellant has failed to carry his appellate burden. In short, the trial court expressly recognized its duty to exercise its discretion in accordance with the factors set forth in *Romero* and *Williams.* Appellant has a lengthy history of criminal behavior, which culminated in the current offenses. It is not irrational to give weight to appellant's extensive criminal history and to find the circumstances of the current offenses egregious rather than to credit appellant's interpretation of the facts by which he suggests that the current offenses are not so egregious. Since the trial court's decision did not exceed the bounds of reason, and is supported by the record, we must uphold the denial of appellant's motion to strike his prior conviction.

*Disposition*

The judgment is affirmed.

_____

ELIA, Acting P. J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.